[No. 27376.   Department Two.   April 5, 1939.]

HOWARD J. RYAN, *Respondent*, v. KVL, INCORPORATED,
*Appellant.*[1]

*E. F. Dailey* and *A. E. Dailey*, for appellant.

*Ballinger, Hutson & Boldt*, for respondent.

GERAGHTY, J.—This action was brought by the plaintiff to recover for the defendant's breach of written contracts. It is alleged in the amended complaint that the defendant corporation owned and operated, under a license and permit from the Federal communications commission, a radio station in the city of Seattle, formerly known as KVL, but now as KEEN; that after extensive negotiations, the plaintiff and defendant entered into two written contracts, forming a single transaction.

[1]Reported in 88 P. (2d) 836.

Under the terms of one contract, denominated "Agency Agreement," it was agreed that the respondent should have possession and operation of the radio station, for the period of three years, upon terms therein expressed, including a down payment of $4,500, and rental thereafter, for the first year, at the rate of $450 per month. By the other contract, called "Option Agreement," the plaintiff, for a down payment of $500, was given an option to purchase the radio station, at any time within the three-year period covered by the agency agreement, for $49,500. If the option was exercised, the plaintiff was to receive credit on the purchase price for the down payments on the two agreements, as well as for all sums paid as rental.

It is alleged that, for a number of years prior to the making of these contracts, the plaintiff had owned and conducted an advertising agency in the city of Seattle, doing a large and profitable volume of business; that the value of the agency was wholly dependent upon plaintiff's personal efforts and management, and that, upon the execution of the contracts, the plaintiff discontinued his advertising business and devoted substantially the whole of his time and efforts to the management and operation of the radio station; and that, as a consequence, the value of his advertising business was destroyed.

It is alleged that, without fault or breach by the plaintiff of his obligations under the contracts, the defendant wrongfully took possession of the radio station and equipment, with the intention of excluding the plaintiff therefrom; that the plaintiff made immediate demand in writing for the possession of the station, but, instead of complying with this demand, the defendant delivered to him a notice purporting to cancel the agreements upon the claimed

ground that the plaintiff had failed to pay a small outstanding account, which the plaintiff thereupon offered to pay by telegram, the offer being refused by the defendant.

It is further alleged that, on May 24, 1937, prior to the exclusion of the plaintiff from the broadcasting station, the defendant received an official letter from the communications commission informing it that the contracts should be filed with the commission for its approval, and requiring that the defendant either file the contracts or procure from the plaintiff cancellation thereof; that the plaintiff demanded of defendant that it either file the contracts with the commission or that rescission or termination of the contracts be effected in writing upon terms fair, equitable, and just to the plaintiff; that negotiations were had between the parties concerning the basis and terms upon which the plaintiff would consent to a rescission; that a form of memorandum outlining the terms and conditions of the proposed rescission was submitted by the plaintiff to the defendant, and the defendant's secretary orally informed plaintiff that the terms stated in the memorandum were satisfactory, and that it would be executed promptly, but that, instead, and without warning or notice, the defendant excluded the plaintiff from the station and served the notice of cancellation.

It is alleged that the plaintiff was damaged by the defendant's breach of the contracts in the amounts expended by him in equipping and operating the station, for the loss of his advertising agency and business, as well as for profits plaintiff would have realized by the management, operation, and purchase of the radio station; and he prays for judgment for the amount of the losses so sustained. As alternative relief, in case damages could not be awarded under

the facts, he prays for a decree rescinding the contracts because of the failure and refusal of the defendant to procure the approval thereof by the Federal communications commission; and that, upon rescission, he recover from the defendant all amounts expended under the terms of the contracts, less such amount as may be found to be reasonable rental for the radio station and equipment for the period of time during which he had its use.

During the trial, plaintiff amended his complaint by striking the allegations and prayer for relief concerning future profits and substituting therefor a claim for the value of his time while engaged in the performance of the contract prior to defendant's breach.

The defendant, in its answer, denied that it had breached the contracts, and alleged affirmatively an oral agreement between the parties that the contracts were not to be submitted by either of them to the Federal communications commission; that the plaintiff and defendant continued to operate the radio station until on or about May 29, 1937, when the defendant canceled the contracts because of plaintiff's violation of their terms.

Trying the cause without a jury, the court made findings of fact and conclusions of law favorable to the plaintiff. It found that the agency and option agreements were executed by the parties November 1, 1936; that, following the execution of the contracts, plaintiff discontinued his advertising business and assumed operation of the radio station, devoting the whole of his time and efforts therein; that he had fully performed all of the obligations of the contracts required to be performed by him, and had made all payments to the defendant required under the contracts, in a total of $8,431.63; that, in addition to the payments to the appellant, the plaintiff incurred and

expended various sums, in a total of $5,060.07, in performance of the contracts; that, after deducting the gross total income from the station, the net outlay of the plaintiff was $10,569.53; and that the fair and reasonable value of his time, efforts, and ability in the performance of his duties under the contract was $1,930.47, making a total damage suffered by him in the sum of $12,500.

The court found that the defendant had breached the contracts without cause in the following particulars:

"(1)   By refusing to submit the contracts to the Federal communications commission for approval when it became known and established that such submission was necessary and upon the request and demand of plaintiff therefor.

"(2)   By repossessing various items of defendant's property to which under said contracts plaintiff was entitled to exclusive use and possession, and in locking the doors of the radio station premises in such a manner as to bar and prevent plaintiff's entry therein and use thereof shortly after 12 o'clock midnight May 28, 1937.

"(3)   By delivery to plaintiff of its cancellation notice, exhibit 7, on the morning of May 29, 1937, and the absolute and unqualified assertion of defendant's officers that defendant would rely and stand upon said purported notice and would absolutely refuse to accord plaintiff the rights and privileges to which plaintiff was entitled under said contracts."

The court made appropriate conclusions of law, and entered judgment in favor of the plaintiff for $12,500. The defendant appeals.

To an understanding of the issues, reference to the facts in some further detail is necessary.

By the terms of the agency agreement, the respondent was authorized to form a corporation to take over the rights and privileges therein granted. After tak-

ing possession of the station, he sought to interest capital in the formation of such a corporation. He encountered difficulty, owing to the fact that the agreement with the appellant had not been approved by the Federal communications commission under the act of 1934, 47 U. S. C. A. (Sup.), § 310 (b), which provides:

"The station license required hereby, the frequencies authorized to be used by the licensee, and the rights therein granted shall not be transferred, assigned, or in any manner either voluntarily or involuntarily disposed of, or indirectly by transfer of control of any corporation holding such license, to any person, unless the Commission shall, after securing full information, decide that said transfer is in the public interest, and shall give its consent in writing."

April 14, 1937, without consulting the appellant, respondent addressed the following letter to the commission:

"There are attached hereto copies of an agency agreement and option recently executed with KVL, Inc.

"At the time these were executed, we had the opinion of two reputable attorneys presumably familiar with such matters, that agreements of this form and nature wherein actual operation and control is not involved, were not required to be filed with, or approved by, the commission.

"However, to be absolutely certain of our position, will you be good enough to give me the benefit of your reactions?

"I would be grateful for your earliest possible response."

He received a letter from the secretary of the commision, dated May 18, 1937, acknowledging receipt of his request for information and enclosing a copy of letter addressed by the commission to the appellant. We quote this letter:

"Mr. Howard J. Ryan has forwarded to the commission a copy of an 'Agency Agreement' which he appears to have entered into with your corporation effective November 1, 1936, and under the terms of which he becomes entitled to 'exclusive rights and privileges' to contract in his own name for all 'advertising and radio broadcasting programs connected therewith' over Station KEEN (formerly KVL), to create and prepare the broadcasting of all advertising and radio programs over the station, subject to the 'authority of the station at all times to preview, review, and censor material broadcast,' and to collect and retain all payments for advertising and broadcasting programs. In return for these privileges it appears that Mr. Ryan will assume all expenses of operation and pay a cash consideration and a monthly rental during the three-year term of the contract, and save the licensee harmless from any litigation, etc., arising during the term of the contract.

"Since it is apparent that the assignee is given the right to the profits and assumes liability for all debts of the station, and has the exclusive right to contract for and arrange programs, subject only to a reserved power of censorship which may never be exercised, it appears that the agreement is in effect a lease of the station and is an assignment of the rights granted under your license and, therefore, constitutes a violation of Section 310(b) of the Commissions Act of 1934, inasmuch as the commission's consent was not applied for and obtained.

"If you desire to make application for assignment of the license, the enclosed forms should be executed and duplicate copies thereof filed immediately with the commission in accordance with the pertinent provisions of Rule 103.18, copy of which is enclosed. If you desire to continue the license in your name, you should cancel the lease agreement in question and immediately re-assume the management and control of the station.

"As this agreement appears to have been in effect since November 1, 1936, the matter should be given your immediate attention."

The respondent testified that, on receipt of this letter, he discussed with the officers of the appellant the necessity of prompt action to preserve their station status in Washington.

"I suggested that we comply with the government's suggestion and submit the contract to the commission on the forms provided for the purpose."

The response of the appellant's officers was that they would not do so. Respondent informed them that he had learned that former Senator Dill, who was then engaged in the private practice of law, was in the city, and suggested that it might be well for them to get his opinion. A conference with Mr. Dill was had, with the result, as testified by respondent:

"We gave Mr. Dill the Slowie [secretary of the commission] letter, Exhibit 4, and showed him copies of the contracts. He read them through rather hastily and said, 'Well, you fellows have got beyond the confines of an agency agreement.' Mr. Ervin Dailey said, 'Well, I drew it up and I suppose I wrote too much into it.' Dill then said that quick action was necessary and he suggested that we wire the commission cancelling the contract, accompanied by a letter from me accepting cancellation. He suggested that we work along together on the matter and that he would assist us in working the matter out. At the conclusion of the meeting it was agreed that that was the thing to do, and it was agreed that Ervin Dailey would draw the notice of cancellation to be sent to the commission and a letter of acceptance which I was to file, and that I was to prepare the data to be sent to Mr. Dill. That was the status of the matter when I left Mr. Dailey about 6 or 6:30 that evening."

The respondent further testified that, in the course of the day, he informed the executive officers of the appellant that his attorney, Mr. Boldt, would not permit him to sign a cancellation agreement without first

having something in writing determining what his position would be.

"The conclusion was that Mr. Boldt was to go back to his office and prepare a memorandum to Mr. Dailey embodying the points that had been discussed. The points settled on were: First, that the cancellation was only by an agreement and that neither party was in any way in default. In the second place, we agreed that we would enter into negotiations as suggested by Senator Dill and with his help look to a revision of the contract. And the third thing was that if we were unable to agree to a revised contract that I would be reimbursed for my investment."

He testified that a memorandum conforming to these suggestions was prepared and submitted to the appellant, but was never signed; and that the appellant, on the night of May 28th or the early morning of May 29th, excluded plaintiff from the broadcasting station by locking or barring the door, and later served him with written notice of a cancellation on the ground that he was in arrears in payment of current bills.

By the judgment, the respondent was awarded $10,569.63 as the net expense incurred in operating the radio station during the seven months when he had control. In this amount was included the initial payment of $5,000 on the two contracts and the rents subsequently paid at the rate of $450 a month. The respondent was allowed $1,930.47 as compensation for his services during the several months' period.

The allowance of these sums was fully warranted by the record. The expenditures were verified by vouchers, and the allowance made respondent for his services is not unreasonable.

The trial court had difficulty in resolving the question whether or not the respondent could maintain a suit for breach of a contract not approved by the communications commission. The court first ex-

pressed the view that the action could not be maintained, but, upon further consideration, and after argument of counsel, reached the opposite conclusion.

It is obvious that, in the absence of approval by the commission, the contract would not be enforceable by an action for specific performance. As a corollary, it would seem that an action for damages would not lie for its breach.

" 'The obligation of a contract in law is that element of. duty or promise which a party can be compelled to perform. If performance cannot be compelled, there is no legal obligation in the contract.' " *Cowley v. Northern Pac. R. Co.*, 68 Wash. 558, 565, 123 Pac. 998, 41 L. R. A. (N. S.) 559.

But the respondent contends that the appellant was obligated by its terms to file the contract with the commission for approval.

It is apparent from the record that the filing of the agency agreement was not contemplated by the parties at the time of its execution. Certainly, no specific provision of the contract requires appellant to file it. The record contains the files of an abortive attempt by the parties to secure approval of a transfer some months before the execution of the present contracts. From these files, it appears that the transferee or assignee is required to join in the application for approval, and it would seem necessarily so, because his financial ability and moral worth are to be considered by the commission in passing upon the application.

Furthermore, what the commission required was that a formal application for transfer of the license be filed, or, in the alternative, that the contract be immediately canceled and the management of the station reassumed by the appellant. But the agency agreement did not provide for a transfer of the license; the transfer was to take place only when the

option to purchase was exercised. Compliance with the requirements of the commission necessitated a contract other than the one made by the parties. The filing of the existing agency agreement would have been an idle gesture, since the commission had already informed the parties, in effect, that it would not be approved.

As a matter of fact, after receipt of the commission's letter, both parties realized that their continued operation under the existing agreement was impossible, and that, as suggested by Mr. Dill, some other arrangement would have to be made. The abortive negotiations succeeding the receipt of the letter was a recognition of this fact.

But while the existing agreement was not enforceable in accordance with its terms, it does not follow that the respondent was remediless. The contract was not illegal or immoral in itself. The communications act does not forbid the sale or lease of stations or the making of contracts to that end, but that, to make the transfer or lease effective, the approval of the commission must be had. It is obvious that, before submission to the commission, the parties must embody their agreement in writing. The commission's approval gives life and binding force to the agreement.

The rule governing the rights of the parties under such circumstances is stated in 2 Restatement of the Law of Contracts, 1115, § 600:

"If neither the consideration for a promise nor the performance of the promise in an illegal bargain involves serious moral turpitude, and the bargain is not prohibited by statute, it is enforceable unless the plaintiff's case requires proof of facts showing the illegality, or they are pleaded by the defendant, and even in that event recovery may be allowed *of anything that has been transferred under the bargain, or*

*its fair value, if necessary to prevent a harsh forfeiture."* (Italics ours.)

In the present case, the respondent, in addition to an initial cash payment of five thousand dollars, spent a considerable sum in maintaining the station above its earnings. He also devoted seven months of his time exclusively to the business. The appellant took possession of the station for alleged breach of contract, which the court found did not exist. In the circumstances, the appellant was entitled to repossession of the station. It would be a harsh rule that would allow repossession without restoring to the respondent what he had put into the station in money and payment of the value of his services.

The trial court was careful to allow recovery to the respondent only to the extent of his contribution in service and money. This he would be entitled to in a suit for rescission, and, as we have seen, he sought rescission as an alternative remedy, if damages could not be awarded to him under the facts for breach of contract.

The judgment is affirmed.

BLAKE, C. J., BEALS, SIMPSON, and MILLARD, JJ., concur.