**Suzanne M. HANSON and Peter C. Hanson, Plaintiffs,**

v.

**McCAW CELLULAR COMMUNICATIONS, INC. and McCaw Communications of Florida, Inc., Defendants.**

**No. 94 Civ. 7201 (LAK).**

United States District Court, S.D. New York.

April 7, 1995.

Charles R. Jacob, III, Kenneth S. Yudel, Miller & Wrubel P.C., for plaintiffs.

Robert D. Kaplan, Katherine L. Sonnenberg, Friedman & Kaplan, for defendants.

## OPINION

KAPLAN, District Judge.

This commercial dispute, which is governed by California law, turns on the parol evidence rule, underpinnings of which sharply divided two of the great judges of this century, Judge Learned Hand and Chief Justice Roger Traynor of California. In the final analysis, I conclude that both would have reached the same result in this case, albeit by different paths. In consequence, defendants' motion to dismiss the complaint, which has been converted into a motion for summary judgment pursuant to FED.R.CIV.P. 12(b), is granted.

### Facts

■ In June 1988, plaintiffs sold their interest in a potentially lucrative cellular telephone system and license in the Melbourne–Titusville–Palm Bay, Florida, area (the "Interest") to McCaw Communications of Florida, Inc. ("McCaw Florida"), a wholly owned subsidiary of McCaw Cellular Communications, Inc. ("MCC"). The contract, as amended, provided for an adjustment in the purchase price in the event McCaw "sold or transferred" the Interest to an unaffiliated third party within six years. In August 1993, prior to the expiration of the six year period, MCC entered into an Agreement and Plan of Merger with American Telephone & Telegraph Company ("AT & T") and applied to the Federal Communications Commission ("FCC") for approval of the transaction.[1] Following a lengthy delay, the FCC granted approval and the merger was consummated in 1994, after expiration of the six year period.

The plaintiffs claim that the McCaw–AT & T merger constituted a "sale or transfer" of the Interest and that the application to the FCC, which occurred within the six year adjustment period, triggered the right to a price adjustment allegedly in excess of $16 million. Defendants argue that the price adjustment was not triggered because the merger, even assuming it constituted a sale or transfer of the Interest, did not occur until after expiration of the six year period. I therefore turn to the contracts and other evidence presented.

### The 1987 Option Agreement

In 1987, the Hansons owned one hundred percent of the partnership interests in P & S Hanson Communications ("P & S"), a partnership that held a construction permit issued by the FCC for the non-wireline (Frequency Block A) cellular mobile telephone system in the Melbourne–Titusville–Palm Beach, Florida, Metropolitan Statistical Area. On May 23, 1987, they entered into an Option Agreement (the "Option Agreement") pursuant to which they granted McCaw Florida an option to purchase, and McCaw Florida gave them the right to put to it, their interest in P & S for $3.75 million during a period that was to begin on the sixth monthly anniversary of the date on which the cellular system would become operational and end three years later. (Cpt Ex. A, §§ 2, 4, 5) The price was payable $750,000 at or before the execution of the Option Agreement and $3 million at the closing following exercise of the option. (*Id.* § 6) The transaction was structured as an option rather than an outright sale because the FCC at that time would not permit the purchase of interests in mobile cellular systems prior to construction and operation. (*Id.* Ex. B, at 1)

The Option Agreement afforded the Hansons some protection against the possibility that McCaw Florida would resell the Hansons' Interest at a higher price. The relevant provision stated in pertinent part:

---

1. Section 310(d) of the Communications Act of 1934, 47 U.S.C. 310(d), prohibits the direct or indirect transfer of any station license, or control over any corporate licensee, without approval by the FCC. A contract of sale conditioned on FCC approval, however, does not violate the Act. *E.g., Ryan v. K.V.L., Inc.,* 198 Wash. 459, 469, 88 P.2d 836, 840 (1939).

"The Purchase Price may be adjusted in the event the interest in the System acquired by Optionee [McCaw Florida] pursuant to exercise of either the Call Option or the Put Option is sold or transferred to another entity not affiliated with [McCaw Florida] within five (5) years from the Closing Date. Such adjustment shall occur if. the proportionate cash equivalent sale price for the Ownership Interests upon resale by [McCaw Florida] (the 'Sale Price') exceeds the Purchase Price.... The additional payment due Optionors [the Hansons] pursuant to the adjustment shall be one-third of the amount by which the Sale Price exceeds the Purchase Price.... The additional payment shall be paid by cashier's or certified check or by bank wire transfer within ninety (90) days of the closing of any such sale. In making the adjustment described herein, a 'proportionate cash equivalent sale price' shall be determined. This amount shall be computed as of the closing date for a sale, by placing a present value on any deferred payments and placing a fair market value on any securities or other types of property paid or to be paid as consideration." (Cpt Ex. A, § 9)

Thus, it provided, roughly speaking, that the Hansons were to receive one-third of the amount by which the price McCaw Florida received on any resale of the Interest within five years exceeded the price McCaw Florida paid to the Hansons.

The Option. Agreement, it should be noted, contains a California choice of law clause and provides that it and a concurrently executed construction agreement (which is not material to this case) "embody the entire agreement and understanding of the parties hereto relating to the subject matter hereof and supersede any and all prior agreements and understandings relating to the subject matter hereof." (*Id.* §§ 25, 21). It provides also that it may not be amended, supplemented or modified except by a writing signed by all parties. (*Id.* § 21)

*The 1988 Amendment*

Subsequent to the execution of the Option Agreement, the FCC changed its policies in a manner that permitted the purchase of the Hansons' Interest prior to construction and operation of the system. *In re Application of Madison Cellular Telephone Co.,* 2 F.C.C.R. 5397, 1987 WL 344762, 1987 FCC LEXIS 3173 (1987). On or about January 20, 1988, the parties entered into a written amendment of the Option Agreement (the "Amendment"). (Cpt. ¶ 6 & Ex. B) The Amendment recited that the "Optionors [the Hansons] wish to take advantage of this change in FCC policy to accelerate the exercise of the Call Option" (*id.,* at 1), and went on to provide that the option period began on the date of the Amendment, that McCaw Florida simultaneously exercised the option, and that a closing would take place "as soon as practicable after FCC approval ..." (*id.,* § 3). One effect of this transaction, of course, was to accelerate the payment by McCaw Florida to the Hansons of $3 million. (Cpt Ex. A, § 6; *id.* Ex. B, § 5)

The Amendment contained also the following paragraph, which is at the heart of this case:

"Section 9 of the Option Agreement is amended to specify that the period during which the Purchase Price may be adjusted shall be six (6) years from the Closing Date, instead of five (5) years. *For the duration of this period, Optionee [McCaw Florida] agrees to notify Optionors [the Hansons] of the impending sale or transfer of any interest in the System acquired as a result of the exercise of the Call Option at the time application is made to the FCC for authority to conduct such sale or transfer, if such authority is necessary, and in any event no later than closing such sale or transfer." (Id. § 7) (emphasis added)

McCaw Florida acquired the Hansons' Interest in P & S pursuant to its exercise of the option on June 10, 1988. (*See* Cpt ¶ 8; Hanson Aff. ¶ 20) The six year period therefore expired on June 10, 1994.

*The AT & T Merger*

On August 16, 1993, ten months prior to the expiration of the six year period, McCaw entered into an agreement and a plan of merger (the "Merger Agreement") with AT & T. (Kaplan Aff.Ex. 2) The parties applied

for FCC approval on August 23, 1993. (Hanson Aff. ¶ 22) The FCC approved the merger on September 19, 1994 (*see* Kaplan Aff.Ex. 6), and the merger took place on that date. Thus, the application for FCC approval took place within the six year period. The consummation of the merger did not.

*The Hanson Affidavit*

The plaintiffs have submitted an affidavit of Suzanne M. Hanson in an effort to establish that the event that triggered the Hansons' right to a price adjustment was the filing of the application for approval of the AT & T–McCaw merger or that the agreements are at least susceptible of that construction.

Mrs. Hanson asserts that plaintiffs and McCaw agreed at the time the Option Agreement was signed that the price adjustment period (then five years) would begin from the latest possible date, the closing of McCaw's purchase of the Hansons' interest, which was to the Hansons' advantage. According to Mrs. Hanson, they did not expressly define when or how the price adjustment would be triggered. (Hanson Aff. ¶ 9)

Mrs. Hanson claims that McCaw approached the Hansons following the *Madison* decision and sought to amend the Option Agreement to permit McCaw to exercise its purchase option without waiting until six months after the system was operational.[2] (*Id.* ¶ 10) She asserts that the Hansons were concerned that acceleration of the exercise of the option would be to their disadvantage in that it could shorten the period during which the Hansons would be entitled to an adjustment in the event of resale. (*Id.* ¶¶ 12–13) So, Mrs. Hanson claims, McCaw agreed to increase the price adjustment period to six years (which is clear on the face of the Amendment) and agreed also that a price adjustment would be required "[i]f an event requiring notification occurred during this time—whether it consisted of a sale or transfer accompanied by an FCC application, or the closing itself if FCC approval was unnecessary ..." (*Id.* ¶ 18) The triggering event, according to Mrs. Hanson, thus was an FCC application. "There was no requirement,"

she says, "that the closing or payment occur within the six-year period where FCC approval was necessary." (*Id.* ¶ 19)

**Discussion**

The basic issues before me are whether the contract unambiguously requires a consummated sale within the six year adjustment period in order to trigger a price adjustment and the proper role of the Hanson affidavit in deciding that question.

The California parol evidence rule, which codifies a good deal of case law, provides in pertinent part:

"(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

"(b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.

"(c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.

"(d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement.

\*   \*   \*   \*   \*   \*

"(g) This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud." CALIF.CODE CIV.P. § 1856 (West 1983).

---

**2.** This statement is flatly inconsistent with the third recital in the Amendment, which asserts that it was the Hansons who wished to accelerate exercise of the option.

To this extent, the rule is familiar to New York practitioners. But the manner in which the rule is applied in California is somewhat different.

■ In *Masterson v. Sine,* 68 Cal.2d 222, 436 P.2d 561, 65 Cal.Rptr. 545 (1968) (in bank), the California Supreme Court, in an opinion by Chief Justice Traynor, flatly rejected the proposition that the question whether the parties intended their writing "to serve as the exclusive embodiment of their agreement" is to be determined by the court solely from the face of the instrument. Faced in that case with an intrafamily contract that lacked an integration clause and that did not address the issue as to which the proffered parol evidence was directed, the court concluded that the alleged additional term was one that naturally might have been made in a separate agreement and declined to exclude parol evidence on the point. Thus, while the question whether a writing was intended as the exclusive embodiment of the parties' agreement is for the court,[3] the court must give at least preliminary consideration to the parol evidence in determining exclusivity. *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 39–40, 442 P.2d 641, 645, 69 Cal. Rptr. 561, 565 (1968); *Gerdlund v. Electronic Dispensers International,* 190 Cal.App.3d 263, 270–71, 235 Cal.Rptr. 279, 282 (6th Dist. 1987).

■ Here, plaintiffs conceded at oral argument that the written agreement was fully integrated.[4] In consequence, under Section 1856, that agreement may not be contradicted, and may not be supplemented with additional consistent terms by parol.

■ That of course does not conclude the analysis. Both California and New York take the view that extrinsic evidence is admissible to explain the meaning of a written instrument only if the instrument is ambiguous. *See Masterson v. Sine,* 68 Cal.2d 222, 436 P.2d 561, 65 Cal.Rptr. 545 (1968) (in bank) (California law); *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990) (New York law). And the law of the two States diverges as to the role of the affidavit in determining the existence of and in resolving ambiguity. The question remains whether the oral understanding urged by the Hansons contradicts the terms of the written agreements or, instead, merely resolves ambiguity.

■ In New York, the existence of ambiguity long has been determined with reference to the general understanding of the language of the instrument. *See Burger King Corp.,* 893 F.2d at 527. This reflects the view, eloquently expressed by Judge Learned Hand, that "[a] contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent." *Hotchkiss v. National City Bank of New York,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.

---

**3.** CALIF.CODE CIV.P. § 1856(d) (West 1983).

**4.** The concession was compelled by the evidence. The Option Agreement explicitly states that it "embod[ies] the entire agreement and understanding of the parties relating to the subject matter hereof ... [and that it] may be amended, supplemented or modified only by writing signed by all parties hereto." While the Amendment contains no similar language, the Amendment is just that: an agreement changing some but not all of the terms of the Option Agreement. Inasmuch as the Option Agreement itself precluded any change in or addition to its terms except in a writing, there was no need for the Amendment to repeat the integration clause. Thus, the explicit terms of the documents are compelling evidence that the parties intended those documents to be the exclusive embodiment of their contract.

While *Masterson* contemplates the consideration of extrinsic evidence on the issue of exclusivity, that evidence leads to no different conclusion here. Unlike the situation in *Masterson,* this was not a contract among family members, and the supposed parol agreement was not the sort of understanding that naturally might have been left out of the formal documentation. This was an arm's length transaction involving millions of dollars among sophisticated business people represented by counsel. Moreover, the Amendment dealt specifically with the precise issue that the Hansons claim was the subject of the parol agreement—the exact circumstances in which the Hansons would be entitled to a purchase price adjustment. Even absent the concession, I would conclude that the parties intended the Option Agreement and the Amendment to be the exclusive embodiment of their contract.

1912), *aff'd sub nom. National City Bank v. Hotchkiss,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913); *accord, Mencher v. Weiss,* 306 N.Y. 1, 7–8, 114 N.E.2d 177 (1953).

In *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561, Chief Justice Traynor rejected this objective theory of contractual obligation in favor of the subjective intentions of the parties. Concluding that the objective theory of contract "can easily lead to the attribution to a written instrument of a meaning that was never intended," [5] the California court held that a court confronted with parol evidence first must consider all of the proffered evidence in order to determine the meaning of the written agreement. If on consideration of all of the evidence the written agreement is reasonably susceptible of the meaning ascribed to it by the proponent of the evidence, then the parol evidence is admissible also to prove that the written agreement in fact had that meaning. If, on the other hand, a consideration of all the evidence results in the conclusion that the written agreement is not susceptible of the meaning ascribed to it by the proponent of the parol evidence, then the parol evidence is not admissible for the purpose of proving the meaning of the writing. *Delta Dynamics, Inc. v. Arioto,* 69 Cal.2d 525, 446 P.2d 785, 72 Cal.Rptr. 785 (1968); *Pacific Gas,* 69 Cal.2d at 40–41, 442 P.2d at 646, 69 Cal.Rptr. at 566; *Winet v. Price,* 4 Cal.App.4th 1159, 6 Cal.Rptr.2d 554 (4th Dist.1992); *Blumenfeld v. R.H. Macy & Co.,* 92 Cal.App.3d 38, 154 Cal.Rptr. 652 (1st Dist. 1979).

While California's approach has been sharply criticized,[6] I am bound to apply it and so I follow the two-step process mandated by California law. First, the Hanson affidavit is provisionally received. Second, I consider whether, in light of all of the evidence, the contract is reasonably susceptible of the interpretation advanced by the Hansons.

The Option Agreement provided that the purchase price "may be adjusted" if the Interest "is sold or transferred ... within five (5) years from" the closing of the purchase of the Interest pursuant to the exercise of the put or call option. The adjustment "shall occur," it said, "if the proportionate cash equivalent sale price for the ... Interest[ ] upon resale ... (the 'Sale Price') exceeds the Purchase Price...." Thus, under the Option Agreement, the event triggering an adjustment was a "sale," specifically a "resale" at a price in excess of the purchase price paid by McCaw Florida to the Hansons.

Plaintiffs argue that the word "sale" commonly is understood to include not only a consummated transaction, but also an executory contract to sell. Mrs. Hanson, moreover, asserts that the parties did not expressly define, at the time the Option Agreement was executed, when or how the price adjustment would be triggered. (Hanson Aff. ¶ 9) Hence, I assume *arguendo* that the word "sale" as used in the Option Agreement was ambiguous as to whether a price adjustment would have been triggered by the execution within the adjustment period of a contract of sale subject to further conditions, for example, to FCC approval. But that is not the end of the matter.

The Amendment extended the price adjustment period from five to six years. It provided also that McCaw Florida, for the duration of that period, would "notify [the Hansons] of the impending sale or transfer of any interest in the System ... at the time application is made to the FCC for authority to conduct such sale or transfer, if such authority is necessary, and in any event no later than closing such sale or transfer." The quoted sentence raises two formidable problems for plaintiffs' position.

The first lies in the requirement that McCaw Florida notify plaintiffs "of the *impending sale* ... at the time [an FCC application] is made ..." (Emphasis added) The Amendment thus contemplates that an FCC application would or, a least, might be filed

---

**5.** 69 Cal.2d at 39, 442 P.2d at 645, 69 Cal.Rptr. at 565, *quoting Universal Sales Corp. v. Cal. Press Mfg. Co.,* 20 Cal.2d 751, 776, 128 P.2d 665, 679 (1942) (Traynor, J., concurring).

**6.** *E.g., Trident Center v. Conn. Gen. Life Ins. Co.,* 847 F.2d 564, 569 (9th Cir.1988); *Winet,* 4 Cal. App.4th 1159, 6 Cal.Rptr.2d 554.

before the occurrence of a "sale" within the meaning of the contract, as the word "impending" otherwise would make no sense. The parties, moreover, agree that the virtually universal practice, and the practice followed here, is that a conditional contract of sale is signed before an application is filed with the FCC.[7] If the word "sale" were construed as plaintiffs contend, the "sale" would occur when a conditional contract is signed or, perhaps, when the FCC application is made. Thus, on plaintiffs' view, the FCC application would be subsequent to or contemporaneous with the "sale." If that were so, the "sale" no longer would be "impending" by the time the FCC application is made. In consequence, the only reading of the agreement that makes sense of the quoted sentence is to regard the consummated transaction as the "sale" and a transaction for which a conditional contract has been signed and which is awaiting FCC approval as an "impending sale."[8]

The second difficulty is in the description of the authority sought from the FCC by the application of which McCaw Florida was required to give notice. The Amendment required notice "at the time application is made to the FCC *for authority to conduct such sale or transfer ...*" (Emphasis added) As we have seen, FCC permission is not required to enter into a conditional contract of sale. The Commission's approval is required only for the *consummation* of a transaction resulting in a change of control over a license. Hence, this language too is consistent only with a construction of the agreement that makes a timely consummation the triggering adjustment event.

Plaintiffs contend that this reading is incorrect based both on the Hanson affidavit and other arguments. I begin with the Hanson affidavit.

Mrs. Hanson asserts that the parties agreed at the time the Amendment was executed that a purchase price adjustment would be triggered by the occurrence within the six year period of any event requiring notification under Section 9 of the Amendment. If the agreements, either considered alone or taken together with Mrs. Hanson's affidavit, were ambiguous on this point, the affidavit would be admissible for the purpose of interpretation. I conclude, however, that Mrs. Hanson's assertion is simply irreconcilable with the language of Section 9 of the Amendment. It can be squared with the Amendment only if Section 9 were read in a manner that would ignore the references to an "impending" sale and to an applications to the FCC "for authority to conduct such sale or transfer ..." Mrs. Hanson's affidavit therefore would serve only to contradict the terms of an agreement which plaintiffs concede is fully integrated. It does not reveal ambiguity latent in the documents. Nor does it aid in construing contractual language. In consequence, I hold that the Hanson affidavit, although provisionally considered for purposes of determining the existence of ambiguity (as to which it adds nothing), is inadmissible under the California parol evidence rule for purposes of construing the contract. Put another way, although the two great judges probably would have disagreed as to whether the Hanson affidavit should be considered in any respect in deciding this motion, I think they would have reached the same result because both would have concluded that it is inadmissible on the issue of contract interpretation.

■ This conclusion is fully supported by the California authorities. Unlike the situation in *Delta Dynamics,* 69 Cal.2d at 528, 446 P.2d at 787, 72 Cal.Rptr. at 787, the Hanson affidavit is not " 'relevant to prove a meaning to which the language of the instrument is reasonably susceptible' " and, as discussed above, "the rest of the contract ... preclude[s the] interpretation" advanced by plaintiffs. In such circumstances, California courts exclude extrinsic evidence as to inter-

---

7. This flows from the fact, noted above, that no FCC license may be transferred, directly or indirectly or by the transfer of control over a corporate licensee, without FCC approval.

Plaintiffs' brief asserted—indeed, invited the Court to take judicial notice of the fact—"that applications for FCC approval are filed rarely, if ever, without an agreement of sale or transfer already having been executed." (Pl.Br. 30)

8. So too, I suppose, an agreement in principle which has not yet resulted in a signed contract of sale.

pretation and grant judgment in accordance with the clear terms of the written agreement. *E.g., FPI Development, Inc. v. Nakashima,* 231 Cal.App.3d 367, 282 Cal.Rptr. 508 (3d Dist.1991) (affirming summary judgment); *Gerdlund v. Electronic Dispensers International,* 190 Cal.App.3d 263, 235 Cal. Rptr. 279 (reversing receipt of parol evidence that contradicted contract and directing judgment for defendant). Indeed, even the most vehement of critics of the California rule so acknowledge. *Trident Center,* 847 F.2d at 569–70 & n. 6.

Plaintiffs' other arguments are unpersuasive.

Plaintiffs are correct in saying that the word "sale" sometimes is used in a manner that includes an executory or conditional contract of sale rather than a consummated transaction. The issue here, however, is the meaning ascribed to that word in the contract. Hence, the cases decided in other contexts and the statutes dealing with other matters upon which plaintiffs rely contribute nothing of importance to the resolution of this matter.

Plaintiffs argue too that the notification provision contained in Section 9 of the Amendment would be rendered "meaningless" by the construction adopted here. (Pl. Br. 17) Why, they ask, would there be any sense in notifying plaintiffs of an application made to the FCC for approval of a contemplated transaction, particularly an application made shortly prior to the expiration of the six year adjustment period, if the price adjustment would be triggered only by consummation of the transaction within the period? The answer, it seems to me, is fairly obvious. Plaintiffs might well have a substantial financial interest riding on favorable and timely FCC action. Persons in such circumstances frequently seek to be heard, whether formally or informally, by agencies. Some even have been known to seek intervention with the responsible agency by their elected representatives in an effort to speed matters to the desired outcome. Hence, plaintiffs' argument that the notification provision would be meaningless unless the price adjustment were triggered merely by an executory contract or an FCC application is zealous advocacy that fails to recognize the practicalities of business life in a regulated industry.

Finally, plaintiffs advanced a contention at oral argument not previously made in their brief. They note that the 1987 Option Agreement states that a price adjustment may be required upon a "sale or transfer" of the Interest within the adjustment period. They point to the Communications Act, which requires prior FCC approval of transfers of station licenses without using the word "sale." And they draw from these premises the conclusion that the "sale" in this case was the AT & T–McCaw merger agreement, while the transfer was the consummation of the transaction. This argument is rejected, as the term "sale" cannot responsibly be read as plaintiffs would read it given the documents executed by these parties.

As both parties have submitted documentary evidence outside the pleadings which the Court has not rejected, and as the Court has considered the Hanson affidavit to the extent outlined above, defendants' motion has been converted by the final sentence of FED. R.CIV.P. 12(b) into a motion for summary judgment. Accordingly, defendants' motion is treated as a motion for summary judgment. The motion for summary judgment dismissing the complaint is granted.

SO ORDERED.