Suzanne M. HANSON; Peter C. Hanson, Plaintiffs–Appellants,

v.

McCAW CELLULAR COMMUNICATIONS, INC.; McCaw Communications of Florida, Inc., Defendants–Appellees.

No. 523, Docket 95–7473.

United States Court of Appeals, Second Circuit.

Argued Nov. 28, 1995.

Decided Feb. 27, 1996.

Joel M. Miller, Miller & Wrubel, New York City (Charles R. Jacob III, Steven M. Lester, Miller & Wrubel, New York City, of counsel), for Plaintiffs–Appellants.

Robert D. Kaplan, Friedman & Kaplan, New York City (Robert S. Loigman, Friedman & Kaplan, New York City, of counsel), for Defendants–Appellees.

Before: OAKES and McLAUGHLIN, Circuit Judges, and KOELTL, District Judge.*

McLAUGHLIN, Circuit Judge:

Suzanne and Peter Hanson (the "Hansons") were the sole members of a partnership that owned a lucrative interest in a cellular telephone system (the "system"). The Hansons sold their interest to McCaw Communications of Florida, Inc., a wholly-owned subsidiary of McCaw Cellular Communications, Inc. (together, "McCaw"). Their agreement provided that, if McCaw "sold or transfered" the system within six years, McCaw would share with the Hansons a percentage of any profit realized on the resale.

McCaw later agreed to merge with American Telephone and Telegraph Company ("AT & T"). Before the six-year profit-sharing period had run, McCaw and AT & T filed for Federal Communications Commission ("FCC") approval of the merger. The FCC did not immediately approve the merger; as a result, the merger was not actually consummated until after the six-year period had run. McCaw refused to pay the Hansons any amount.

The Hansons sued McCaw for breach of contract in the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*), demanding a share of McCaw's merger profits. McCaw moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6), arguing that the resale did not occur until the closing of the merger, after the six-year period had run. The Hansons submitted the affidavit of Suzanne Hanson, contending that the "sale" took place when the agreement to merge was reached, prior to the filing for FCC approval, and within the six-year period.

Applying the California parol evidence rule, the district court held that because the sale contract was not reasonably susceptible of Suzanne Hanson's interpretation, the affidavit was inadmissible. The court then converted McCaw's motion into a motion for summary judgment, granted summary judgment to McCaw, and dismissed the Hansons' complaint. *See Hanson v. McCaw Cellular Communications, Inc.,* 881 F.Supp. 911 (S.D.N.Y.1995). The Hansons now appeal, renewing the same arguments. We hold that the district court properly applied California parol evidence law and properly granted summary judgment for McCaw.

---

* Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

## BACKGROUND

The facts and circumstances of this case are set forth at length in the district court's published opinion. *See Hanson,* 881 F.Supp. at 913–15. We summarize them.

The Hansons were the sole members of a California general partnership, which in turn owned an FCC construction permit for a cellular telephone system in Florida. On May 23, 1987, the Hansons signed an Option Agreement (the "Agreement") giving McCaw the right to buy the system during a three-year period beginning on the six-month anniversary of the date on which the system became operational. McCaw was to pay $750,000 at or before the execution of the Agreement, and $3 million at the closing after exercising the option. The deal had to be crafted as an "option" instead of an outright sale, however, because the FCC did not then allow the purchase of cellular telephone systems before they were constructed and operational.

The Hansons were distressed that, by selling the system, they might lose out on future increases in its value. For this reason, the Agreement provided that the Hansons would share in any profit if McCaw resold the system within five years. The critical language is:

9. *Adjustment to Purchase Price*

The Purchase Price may be adjusted in the event the interest in the System acquired by [McCaw] pursuant to exercise of either the Call Option or the Put Option is sold or transferred to another entity not affiliated with [McCaw] within five (5) years from the Closing Date.... The additional payment due [the Hansons] pursuant to the adjustment shall be one-third of the amount by which the Sale Price exceeds the Purchase Price (as increased by any capital contributions made by or increases in the capital account of [McCaw] ). The additional payment shall be paid by cashier's or certified check or by bank wire transfer within ninety (90) days of the closing of any such sale....

The parties also included the following choice of law provision:

25. *Governing Law*

This Agreement shall be governed by and interpreted in accordance with the laws of the State of California applicable to agreements made and performed entirely in that state.

After the Agreement was signed, but before the option period had begun to run, the FCC changed its policy to allow the purchase of unconstructed and nonoperational cellular telephone systems. *See In re Madison Cellular Tel. Co.,* 2 F.C.C.R. 5397 (1987). In order to take advantage of this policy change, on or about January 20, 1988, the Hansons and McCaw entered into a written amendment (the "Amendment") to the Agreement, providing that the option period began running upon the date of the Amendment, and that McCaw simultaneously exercised the option. Because the acceleration of the deal effectively shortened the time that the Hansons were entitled to their profit-sharing right, the Amendment further provided:

7. *Adjustment to Purchase Price*

Section 9 of the Option Agreement is amended to specify that the period during which the Purchase Price may be adjusted shall be six (6) years from the Closing Date, instead of five (5) years. For the duration of this period, [McCaw] agrees to notify [the Hansons] of the impending sale or transfer of any interest in the System acquired as a result of the exercise of the Call Option at the time application is made to the FCC for authority to conduct such sale or transfer, if such authority is necessary, and in any event no later than closing such sale or transfer.

McCaw's purchase of the system closed on June 10, 1988. The six-year period governing the Hansons' right to share the fruits of any future sale or transfer by McCaw thus expired on June 10, 1994.

On August 16, 1993, ten months *prior* to the expiration of the six-year profit-sharing period, McCaw entered into a conditional agreement and plan of merger with AT & T. On August 23, 1993, McCaw and AT & T filed for the required FCC approval of the merger. *See* 47 U.S.C. § 310(d). After much time and public debate that was widely bruited in every major newspaper, and after a pair of United States District Court rulings

on whether the merger would violate a standing AT & T consent decree, *see United States v. Western Elec. Co.*, 154 F.R.D. 1 (D.D.C.1994), *aff'd*, 46 F.3d 1198 (D.C.Cir. 1995); *United States v. Western Elec. Co.*, 158 F.R.D. 211 (D.D.C.1994), *aff'd*, 46 F.3d 1198 (D.C.Cir.1995), the FCC approved the merger on September 19, 1994. The merger was consummated that same day, which, of course, was three months *after* the expiration of the six-year profit-sharing period.

McCaw refused to share any of its profit with the Hansons, who then sued in the Southern District of New York. The Hansons claimed that McCaw, through the AT & T merger, realized a profit on the sale of the system of not less than $50 million, and that McCaw's failure to share some of it was a breach of the Agreement. McCaw moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6), arguing that, even if the merger constituted a "sale or transfer," and which McCaw conceded for purposes of the motion only, that sale occurred on September 19, 1994, clearly after the six-year period had run.

In response, the Hansons proffered the affidavit of Suzanne Hanson, in which she claimed that the parties had agreed that the profit-sharing provision would be triggered if, within six years, McCaw *applied to the FCC* for permission to sell or transfer the system. The district court received the affidavit and, pursuant to California parol evidence law, considered whether the Agreement was susceptible of the Hansons' interpretation. Finding that it was not, the court converted McCaw's motion into a motion for summary judgment (because the court had considered evidence beyond the pleadings), and granted that motion, thereby dismissing the Hansons' complaint.

## DISCUSSION

■■■ We review a grant of summary judgment *de novo. Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir.1995). "Summary judgment is proper only if, viewing all evidence in the light most favorable to the nonmoving party, there is no genuine

issue of material fact." *Id.; see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When the interpretation of a contract is at issue, summary judgment is proper where the language of the contract is unambiguous, lending itself to only one reasonable interpretation. *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir.1994); *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120–21 (2d Cir.1985).

### I. *The California Parol Evidence Rule*

■■■ The Agreement between the Hansons and McCaw is a contract, and Suzanne Hanson's affidavit is parol evidence offered to interpret that contract. California,[1] like most states, provides that, where a contract is fully integrated, it may not be contradicted, supplemented, or varied by parol evidence. Ca.Civ.P.Code § 1856(b) (1983); *see also Masterson v. Sine*, 68 Cal.2d 222, 65 Cal.Rptr. 545, 547, 436 P.2d 561, 563 (1968) (in bank). There is an exception recognized in California: even if a contract is integrated, parol evidence is admissible to explain the meaning of the contract, if the contract is ambiguous. Ca.Civ.P.Code § 1856(g) (1983); *see also Pacific Gas and Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 564, 442 P.2d 641, 644 (1968) (in bank).

■■■ "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas*, 69 Cal.Rptr. at 564, 442 P.2d at 644. Thus, when a party offers parol evidence to resolve a buried ambiguity in a contract, the parol evidence is provisionally admitted. *Blumenfeld v. R.H. Macy & Co.*, 92 Cal.App.3d 38, 154 Cal.Rptr. 652, 655 (1979); *see also Delta Dynamics, Inc. v. Arioto*, 69 Cal.2d 525, 72 Cal.Rptr. 785, 787 446 P.2d 785, 787 (1968) (in bank). The court must then decide whether the interpretation of the contract suggested by the parol evi-

1. All parties acknowledge that, under § 25 of the   Agreement, California law applies.

dence is reasonable. If so, the parol evidence is fully admissible to prove that the contract actually has such meaning; if not, the parol evidence is inadmissible. *Blumenfeld,* 154 Cal.Rptr. at 655–56; *see also Delta Dynamics,* 72 Cal.Rptr. at 787, 446 P.2d at 787 (quoting *Pacific Gas,* 69 Cal.Rptr. at 565, 442 P.2d at 645).

## II. *The Meaning of "Sale"*

The Agreement here is fully integrated. *Hanson,* 881 F.Supp. at 916 & n. 4 ("plaintiffs conceded . . . that the written agreement was fully integrated"); *see also Banco Do Brasil, S.A. v. Latian, Inc.,* 234 Cal. App.3d 973, 285 Cal.Rptr. 870, 886 (1991) (an integration clause "may well be conclusive on the issue of integration"), *cert. denied,* 504 U.S. 986, 112 S.Ct. 2967, 119 L.Ed.2d 588 (1992). Consequently, Suzanne Hanson's affidavit is admissible only if, in light of both the Agreement itself and the proffered affidavit, the Agreement is ambiguous and reasonably susceptible of the interpretation set forth in the affidavit.

### A. *The Agreement and the Amendment*

■ The Hansons argue that they and McCaw intended the term "sale," as used in § 9 of the Agreement, to include an agreement to sell. Because McCaw and AT & T reached an agreement to merge, and filed for FCC approval, ten months before the end of the six-year period, the Hansons believe they are entitled to their piece of ·the pie. McCaw, on the other hand, argues that the term "sale" is a term of art and unambiguously means only a completed sale. In McCaw's view, the trigger for the profit-sharing provision was the consummated merger, three months after the six-year period had run. We agree with McCaw.

■ Standing in naked isolation, the term "sale" in § 9 of the original contract might be somewhat ambiguous. But it does not stand alone. A contract "must be construed as a whole and the intention of the parties must be ascertained from the consideration of the entire contract, not some isolated portion." *County of Marin v. Assessment Appeals Bd.,* 64 Cal.App.3d 319, 134 Cal.Rptr. 349, 352 (1976); *see also Mellon Bank,* 31 F.3d at 116;

*Universal Sales Corp. v. California Press Mfg. Co.,* 20 Cal.2d 751, 128 P.2d 665, 675 (1942) (in bank). Here, § 7 of the Amendment expressly amended § 9 of the Agreement. And any cloud hovering above the term "sale" as used in § 9 was dissolved by § 7.

Section 7 of the Amendment states that McCaw must "notify [the Hansons] of the *impending* sale or transfer . . . at the time application is made to the FCC *for authority to conduct* such sale or transfer" (emphasis added). This language unambiguously reflects the parties' understanding that there is a difference between an agreement to sell and an actual sale, and that a "sale" occurs, within the meaning of § 9 (as amended by § 7), only when the transaction is consummated. There are several signposts towards this conclusion.

First, if a "sale" is "impending" at the time of the FCC filing for approval of the transaction, then obviously the "sale" cannot yet have occurred at that time. The Hansons try to escape this cul-de-sac by claiming that "impending" is used in "a colloquial sense to refer to the fact that a sale requiring [McCaw to give the Hansons] notice has occurred and is the subject of an application to the FCC." Frankly, we are entirely unfamiliar with this "colloquial" use of "impending."

■ "Impending" means "about to take place"—that is, a *future* event. *The American Heritage Dictionary* 645 (2d College ed. 1991); *see also Webster's Third New International Dictionary* 1133 (Unabridged ed. 1981) ("impending" means "about to occur"; to "impend" means to "give promise of occurring in the immediate future"). It would, for example, surely shock the drafters of the Federal Rules of Evidence to learn that, when they provided for the admission of statements made "under belief of impending death," *see* Fed.R.Evid. 804(b)(2), according to the Hansons' interpretation of the word, they were allowing for statements made by someone who thought himself already dead. And, "if the meaning a layperson would ascribe to contract language is not ambiguous," we must apply that meaning. *AIU Ins. Co.*

*v. Superior Court,* 51 Cal.3d 807, 274 Cal. Rptr. 820, 831, 799 P.2d 1253, 1264 (1990) (in bank); *see also Hayter Trucking, Inc. v. Shell W. E & P, Inc.,* 18 Cal.App.4th 1, 22 Cal.Rptr.2d 229, 238 (1993) (words in a contract are generally construed according to their plain or ordinary meaning).

Second, if an application to the FCC is necessary for "authority to conduct" a "sale," then a "sale" cannot ordinarily have occurred at the time of that application. Indeed, if the FCC would have refused permission to McCaw and AT & T to merge, the deal would have necessarily been scrapped—yet the Hansons are compelled by their argument to state that, in that situation, a "sale" would have nonetheless occurred (albeit, there would be no "profit" to share). Such tortured interpretation, in the face of clear contractual language, does not create an ambiguity.

**B.  *Suzanne Hanson's Affidavit***

■■■■  Ambiguity in a contract, however, is not gauged merely within the four corners of the document. The proffered parol evidence itself must also be considered. *Pacific Gas,* 69 Cal.Rptr. at 564, 442 P.2d at 644. If the parol evidence sets forth an interpretation of the contract to which the contract is "reasonably susceptible," it will compel a conclusion that the contract, even if seemingly clear on its face, is ambiguous, and that the parol evidence should be fully admitted. *Id.* But "[i]f the evidence offered would not persuade a reasonable man that the instrument meant anything other than the ordinary meaning of its words, it is useless." *Blumenfeld,* 154 Cal.Rptr. at 656 (quotations and citations omitted).

■■■■  Suzanne Hanson's affidavit does not set forth an interpretation to which the contract is reasonably susceptible. The affidavit claims that the parties intended "sale" to include an agreement to sell, and intended that the profit-sharing provision would be triggered if, within six years, McCaw applied to the FCC for permission to sell or transfer the system. But this proffered explanation does not clarify the Agreement's language, nor even offer a plausible interpretation of § 9, as amended by § 7. Rather, it flatly contradicts the language of the Agreement as discussed above. In order to accept the Hansons' contention that a "sale" occurs prior to the FCC filing, we would have to read "impending" out of the Agreement, and ignore the Agreement's recognition that the purpose of filing was to seek authority for such "sale." An interpretation which so eviscerates plain language of the contract is not one to which the contract is "reasonably susceptible."

The Hansons present several unpersuasive arguments to support the interpretation in Suzanne Hanson's affidavit as a reasonable one. First, they rely on *Universal Sales Corp. v. California Press Manufacturing Co.,* 20 Cal.2d 751, 128 P.2d 665 (1942) (in bank), for the proposition that, under California law, the word "sale" may include an agreement to sell. But *Universal Sales* expressly indicated that "the interpretation of ["sale"] . . . in any particular case is controlled by the context of the writing, and the whole of the instrument must be examined." *Universal Sales,* 128 P.2d at 675. Our question, then, is not whether "sale" may generally include an agreement to sell, nor whether it was so intended in some other case. Rather, it is whether the parties intended "sale" to include an agreement to sell in *this contract.* The language of the Agreement, as amended, quite clearly shows they did not.

Second, the Hansons argue that the phrase "sale or transfer" is not a unitary concept, and that the words "sale" and "transfer" mean different things. They argue that the "sale" is the agreement to sell, and that the "transfer" is the subsequent closing and assignment of rights under the agreement to sell. Initially, we doubt whether the terms are properly read apart from each other— both the agreement, and Suzanne Hanson's affidavit, use the terms only as a unitary phrase, and never refer to a "sale" or "transfer" apart from the other. Even if the terms were separate, however, our analysis would not change—"impending" modifies both "sale" and "transfer" in § 7, and § 7 recognizes that authority from the FCC is needed for both.

The Hansons also argue that if "sale" means only a completed sale, their right to collect under the profit-sharing provision becomes subject to the whims of FCC approval, which may make the process interminable. Indeed, the spectre was raised at oral argument that a devious McCaw could have asked the FCC to postpone approving the merger until after the six-year period had run, thus robbing the Hansons of their profit share. In such a case, issues of good faith owed by parties to a contract would then arise and perhaps command a different result. But that is not our case. McCaw and AT & T diligently filed for FCC approval within a week of reaching their conditional agreement to merge. And, as mentioned, the merger was the subject of heated public and legal debate. *See, e.g.*, Leslie Cauley, *Bell Atlantic and Nynex Sue to Block AT & T's Planned Acquisition of McCaw*, Wall St.J., Aug. 9, 1994, at B7; Bruce T. Guptill, *Letters to the Editor: AT & T/McCaw Union No Threat to Bells*, Wall St.J., October 7, 1993, at A19; *see also Western Elec.*, 154 F.R.D. at 10 (alluding to philosophical and policy issues intertwined with the McCaw–AT & T merger). There is simply no indication, nor any allegation, that McCaw did not at all times vigorously push for FCC approval of its desired merger.

In sum, the interpretation set forth in Suzanne Hanson's affidavit is not one to which the Agreement as amended is reasonably susceptible, and the district court properly refused to admit this parol evidence to contradict the language of the Agreement. There remained only one feasible interpretation of the Agreement—that "sale," as used in § 9 and § 7, was intended to mean a completed transaction, and that such a sale had not occurred before the expiration of the six-year purchase price adjustment period. Therefore, the district court properly granted summary judgment for McCaw and dismissed the Hansons' complaint.

## CONCLUSION

We have considered all of the Hansons' additional arguments and find them unavailing. Accordingly, the judgment of the district court is AFFIRMED.

OAKES, Senior Circuit Judge, dissenting:

I respectfully dissent.

The practical effect of the majority's decision, of course, is to reward McCaw for failing to notify the Hansons of the McCaw/AT & T merger and to penalize the Hansons because the FCC, instead of granting authority to conduct the merger within the ten months remaining in the six-year price adjustment period, waited until three months after the price adjustment period expired to consent.

I do not believe that the law supports this result. I think that the word "sale" in section 9 of the original contract between the Hansons and McCaw is ambiguous. I also think that the use of the word "impending" in the phrase "impending sale" in section 7 of the Amendment to that contract does not, as the majority claims, clear up the initial ambiguity.

I start with the proposition that the Hanson/McCaw Option Agreement's original provision that a price adjustment would occur in the event McCaw "sold or transferred" the System within five years from the closing date of the transaction is ambiguous. The district court agreed, as it had to, since a "sale" can mean in ordinary parlance an executed sale or a contract to sell. *See Hanson v. McCaw Cellular Communications, Inc.*, 881 F.Supp. 911, 917, 919 (S.D.N.Y.1995). Here, the phrase "sale or transfer" could mean either the execution of a sales contract subject to further conditions such as FCC approval, or the closing of such a sales contract by the transfer of title to the System. Since the contract does not specify which meaning the parties intended, it is, as the district court said, "ambiguous." *Id.* at 917; *see also id.* at 919 ("Plaintiffs are correct in saying that the word 'sale' sometimes is used in a manner that includes an executory or conditional contract of sale rather than a consummated transaction"). I find further support for this proposition in California law and the common law generally, where the term "sale" is "frequently used in the sense of an agreement to buy or sell." *Universal Sales Corp. v. California Press Mfg. Co.*, 20

Cal.2d 751, 768, 128 P.2d 665, 675 (1942). The district court found this well-settled principle of law irrelevant.

Both the district court and the majority find the original contract unambiguous based upon the use of the word "impending" in section 7 of the Agreement to Modify. It does well here to repeat section 7 in its entirety:

> Section 9 of the Option Agreement is amended to specify that *the period during which the Purchase Price may be adjusted* shall be six (6) years from the Closing Date, instead of five (5) years. *For the duration of this period,* Optionee [McCaw] agrees to notify Optionors [plaintiffs] of the impending sale or transfer of any interest in the System acquired as a result of the exercise of the Call Option *at the time application is made to the FCC for authority to conduct such sale or transfer, if such authority is necessary,* and in any event no later than closing such sale or transfer. [Emphasis added.]

As explained in the affidavit of Suzanne Hanson—concededly admissible preliminarily under California law for the purpose of determining whether the contract is ambiguous—the reason that the original Option was renegotiated in January of 1988 was that late in 1987 the FCC changed its policy so as to allow cellular permits to be transferred before a system became operational. McCaw was eager to take advantage of this change in FCC policy by purchasing Hanson's non-operational System. Naturally, the Hansons were concerned that McCaw's purchase of the System a year earlier than originally anticipated would affect the Hansons' right to a price adjustment as outlined in paragraph 9 of the original Option.

Section 7 of the Amendment, as ultimately negotiated, extended the price adjustment period from five to six years to compensate for the fact that McCaw was purchasing the System earlier than originally contemplated. In doing so, it specified what events would trigger the price adjustment clause, namely, (a) the filing of "an application ... to the FCC" in connection with the sale or transfer, if FCC approval of the sale or transfer were necessary, or (b) if FCC filing were unneces-

sary, the closing of the transaction. The section 7 amendment further provided that McCaw would notify the Hansons if either of these events occurred during the six-year duration of the price adjustment period.

Thus, the price adjustment period and the notification period were expressly coextensive. This carries with it, it seems to me, the proposition that if either of the events requiring McCaw to notify the Hansons occurred during the six-year period, the Hansons would receive a price adjustment. The actual "additional payment pursuant to the adjustment" was due only in the event there were a closing of the sale or transfer, thus referring back to the clause in the original Option paragraph 9, reading: "The additional payment shall be paid by cashier's or certified check or by bank wire transfer within ninety (90) days of the closing of any such sale." This reading of section 9 of the original Option Agreement and section 7 of the Amendment seems to me entirely plausible and certainly precludes summary judgment.

The district court and majority rely on the word "impending" in the phrase "impending sale or transfer," and find a price adjustment due only if the sale or transfer were completed within the six-year price adjustment period. This interpretation, however, renders meaningless the section 9 language that payment will be due 90 days after "closing" of the sale, thereby distinguishing between a "sale" and a closed sale.

Furthermore, I hardly think that the use of the word "impending" in the Federal Rules of Evidence, in discussing dying declarations, is particularly significant in the context of this privately-negotiated contract. Moreover, I do not think that the use of the word "impending" in F.R.E. 804(b)(2) was particularly well chosen; indeed, the hearsay exception in question speaks both of "imminent" and of "impending" death.

Much to be preferred, in my view, is an overall appreciation of the context in which the phrase is used. It is likely that the parties used the phrase "impending sale or transfer" in the Amendment to their original contract simply to specify one of the events triggering McCaw's duty to notify and subse-

quently pay the Hansons upon FCC approval, just as the phrase "closing of such sale or transfer," when FCC approval was not required, specified the other triggering event. If this is correct, these phrases do not shed light on the term "sale" in the original Option, and we are left only with the conceded ambiguity of the original section 9. To interpret this section, parol and other evidence should be admissible at trial under California law. Therefore, summary judgment should have been denied.