AEROTEL, LTD. and Aerotel, U.S.A., Inc., Plaintiffs,

v.

RSL COMMUNICATIONS, LTD., Deltathree.com, Inc., and RSL Com Primecall, Inc., Defendants,

and

RSL Com U.S.A., Inc., Additional Counterclaim Plaintiff,

RSL Communications, Ltd., Deltathree.com, Inc., and RSL Com Primecall, Inc., Third Party Plaintiffs,

and

RSL com U.S.A., Inc., Additional Third Party Plaintiff,

v.

NACT Telecommunications, Inc., Third Party Defendant.

No. 99 CIV. 10398 SAS.

United States District Court, S.D. New York.

May 19, 2000.

"RSL") for infringing its U.S. Patent Number 4,706,275 (the "275 Patent") through the use of certain prepaid calling card equipment and software (the "NACT System") purchased from NACT Telecommunications, Inc. RSL and RSL Com U.S.A., Inc. ("RSL USA") have, in turn, brought a third party complaint against NACT Telecommunications, Inc. ("NACT") based, *inter alia*, on an indemnification clause contained in a series of contracts entered into between the parties (the "RSL–NACT Agreements"). Based upon an arbitration clause contained in the RSL–NACT Agreements, NACT now seeks to dismiss the third party complaint or, alternatively: stay the third party action; transfer the third party action to the United States District Court for the District of Utah; and/or compel arbitration against RSL and RSL USA. For the following reasons, NACT's motion is granted and the third party complaint is dismissed.

Jonathan Young, Andrew B. Messite, Reed Smith Shaw & McClay LLP, New York City, for Third Party Plaintiffs.

Harry Frischer, Emily Stern, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York City, Robert A. Bartlett, J. Michael Levengood, Nicole M. Imamshah, Long Aldridge & Norman LLP, Atlanta, GA, for Third Party Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs Aerotel, Ltd. and Aerotel U.S.A., Inc. (collectively "Aerotel") have sued RSL Communications, Ltd. ("RSL Ltd."), Deltathree.com, Inc., and RSL Com Primecall, Inc. ("Primecall") (collectively

## I. Facts

In a series of Sale and Services Agreements entered into by NACT and either RSL's predecessor-in-interest, Intelco Global Information Systems ("ITG"),[1] or RSL USA, NACT agreed to protect RSL USA, its predecessor-in-interest (ITG), and its wholly-owned subsidiary (Primecall), against any claims that the NACT System infringes a valid United States patent. Specifically, the RSL–NACT Agreements provide as follows:

> NACT warrants to CUSTOMER that the System will comply in all material respects with all applicable federal, state and local laws and regulations in force on the effective date of this Agreement.

1. In 1996, ITG, referred to by NACT as "TGIS" and "GIS," purchased and licensed equipment and software from NACT which serves, in part, as the basis for Aerotel's claims against RSL. *See* Affidavit of A. Lindsay Wallace, Chief Executive Officer of NACT, dated January 12, 2000 ("Wallace Aff.") ¶¶ 7–8. In February 1997, RSL Ltd. acquired a majority interest in ITG's parent company, International Telecommunications Corp. ("ITC"), which became RSL USA. Then, in June 1997, ITG became Primecall. *See* Affidavit of Arnold Goodstein, President of Primecall, dated February 11, 2000 ("Goodstein Aff.") ¶ 7. Thus, ITG is RSL's predecessor-in-interest.

Wallace Aff. Exs. 2, 3 and 5 § 5.3 and Exs. 7, 9, 10 and 13 § 4.3.[2] The Agreements also provide that:

> NACT shall have the right and obligation to defend any action brought against CUSTOMER based upon an allegation that the System or any component thereof infringes a United States patent or copyright.

Wallace Aff. Exs. 2, 3, and 5 § 7.4 and Exs. 7, 9, and 10 § 7.5.[3]

In addition to this indemnification clause, NACT published a newsletter, dated March/April 1995, Vol. 5, No. 1, entitled "News from NACT" (the "Newsletter"). Goodstein Aff. ¶ 9. In an article entitled "Aerotel Brings Prepaid Calling Card Concerns to NACT Customers," NACT made the following Special Report:

> Recently a few of our customers have received letters from counsel to Aerotel, Ltd. concerning U.S. patent number 4,706,275. The letters inform switch owners that the patent applies to the prepaid calling card process and that the switch owner can apply for licensure in order to continue active in the prepaid calling card market. Unspoken but implied is the message that switch owners will be guilty of infringement if they do not receive Aerotel's license.
>
> With the assistance of our counsel, NACT has taken the position that the patent does not apply to NACT systems. . . .
>
> In 1981, NACT president Kyle Bowen Love and engineer Randy Johnson were utilizing the technology in a university

environment, and the feature was acquired by NACT. . . .

> NACT is requesting a waiver of exemption from Aerotel's patent. . . . All customers will be apprised of its request for waiver and, if necessary, NACT's litigation to invalidate the applicability of the patent to NACT's technology and customers. *NACT's customers are protected by their sales agreements as to patent infringement.*

Goodstein Aff. Ex. C at 2 (emphasis added).

Despite the representations made in the "Special Report," NACT was sued by Aerotel and, in October 1998, entered into a Settlement Agreement. Goodstein Aff. ¶ 14. In that Settlement Agreement, "NACT acknowledges that it does not and will not challenge or otherwise contest the validity, enforceability, or infringement by Prepaid Software of the '275 Patent. NACT further acknowledges that it will not financially underwrite litigation that challenges or otherwise contests the validity, enforceability, or infringement by the Prepaid Software of the '275 Patent." *See* Settlement Agreement, Ex. D to Goodstein Aff. at 13. In that Agreement, NACT further covenants that it "shall not indemnify its Customers for infringement of the '275 Patent, unless obligated to do so by a court of competent jurisdiction". *Id.* at 18.

NACT then sent a letter to RSL USA, dated December 1, 1998, advising it of the Aerotel/NACT Settlement. Despite the explicit language contained in the RSL–

---

**2.** Section 5.3 is found in Exhibits 2, 3 and 5 while section 4.3 is found in Exhibits 7, 9, 10 and 13.

**3.** Curiously, Exhibit 13, which is an August 13, 1998 Sale and Services Agreement, Wallace Aff. ¶ 18, does not contain a similar provision. Rather, it states that:

> NACT provides no warranty and will not indemnify CUSTOMER with respect to infringement of any patents or other intellectual property rights relating to the use of the System for prepaid debit card applications. NACT hereby expressly DISCLAIMS

all warranties or duties of indemnification, howsoever arising, relating to the use of the SYSTEM for such prepaid debit card applications. Instead, CUSTOMER shall be responsible for obtaining a license from any party holding patent or other intellectual property rights that cover or relate to prepaid debit card applications.

Wallace Aff. Ex. 13 § 7.5. Apparently, this new language was inserted to mirror the terms of the Settlement Agreement contemplated by Aerotel and NACT, discussed *infra.*

NACT Agreements by which NACT sold the NACT System to RSL USA, its subsidiary, and its predecessor-in-interest, NACT now took the position that:

- NACT would not contest the validity of the 275 Patent;
- NACT would not indemnify its customers for the use of products already purchased; and
- The NACT System could no longer be used by its purchasers absent a license from Aerotel.

*See* Letter from Eric Gurr, NACT's Chief Financial Officer, to RSL USA, dated December 1, 1998, Ex. F to Goodstein Aff. That letter also advised RSL USA that the following notice would be included on NACT's Prepaid Software and Prepaid Software Updates:

RECEIPT OF THIS PREPAID SOFTWARE DOES NOT INCLUDE ANY EXPRESS OR IMPLIED LICENSE, OR CONVEY AN [sic] RIGHT OF ANY KIND WHETHER BY EXPRESS LICENSE, IMPLIED LICENSE, THE DOCTRINE OF PATENT EXHAUSTION OR OTHERWISE, TO USE OR RESELL THIS PREPAID SOFTWARE. UNLICENSED USE OR SALE OF THIS PREPAID SOFTWARE MAY INFRINGE U.S. PATENT NO. 4,706,275. NACT HAS AGREED WITH THE PATENT OWNER NOT TO CONTEST THE VALIDITY, ENFORCEABILTY OR INFRINGEMENT OF THE PATENT BY THIS PREPAID SOFTWARE. A LICENSE FOR THIS PREPAID SOFTWARE CAN BE OBTAINED FROM AEROTEL.

*Id.* at 2.

Because of NACT's revised position with regard to the 275 Patent, RSL and RSL USA have brought a third party complaint ("TP Cmpl.") against NACT. In their first cause of action, third party plaintiffs allege unfair competition and violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). These claims arise from the fact that the representations made in NACT's "Special Report" are contrary to the Aerotel/NACT Settlement Agreement and are therefore false and misleading. TP Cmpl. ¶¶ 26–29. Similarly, third party plaintiffs' tenth and eleventh causes of action, for fraud and negligent misrepresentation, are also premised on the representations made in the "Special Report." *Id.* ¶¶ 61–64, 67–70. The remaining causes of action for, *inter alia,* breach of contract and indemnification, are contractual in nature and arise from provisions found in the RSL–NACT Agreements.

NACT, however, believes it is not required to litigate RSL's claims but is entitled to arbitrate those claims in Salt Lake City, Utah. RSL and RSL USA oppose arbitration.[4] In support of arbitration, NACT cites the following arbitration clause found in the RSL–NACT Agreements:

All disputes arising out of or in connection with this Agreement *other than dis-*

---

**4.** In opposing arbitration, RSL points to a 1991 Sales Agreement entered into between NACT and Public Switch Corporation ("PSC") which contains an indemnification clause but does not contain an arbitration clause. *See* Goodstein Aff. Ex. A. According to RSL, PSC filed for bankruptcy in 1996 and entered into an Asset Purchase Agreement with ITG whereby it sold all of its assets to ITG, Primecall's predecessor-in-interest, including the LCX Platform purchased in 1991. *Id.* ¶ 7. However, the use of this switch was discontinued in 1996 when ITG returned to NACT "the two LCX 240 port switch components that had previously been sold to Public Switch Corporation (the "PSC Switches"), and thereby obtained a prior reduction of $138,342 below the retail purchase price of the two new STX 960 port switches." Affidavit of Benjamin D. Winnie, Director of Sales of NACT, dated March 1, 2000 ¶ 12. Because the asset purchased in the 1991 Sales Agreement, even if infringing, was discontinued prior to the commencement of Aerotel's lawsuit against RSL, RSL cannot base its indemnification action against NACT on this Agreement. Accordingly, it is the arbitration clauses found in the RSL–NACT Agreements, and not the absence of such in the 1991 PSC–NACT Agreement, that govern the outcome of this dispute.

putes arising out of any unauthorized use of the Licensed Software or Documentation, related to NACT's Confidential Information, or related to NACT's recovery of the System upon CUSTOMER's breach, shall be finally settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The place of arbitration shall be Salt Lake City, Utah, and the arbitrators shall determine the matters in dispute in accordance with the law of the State of Utah. Wallace Aff. Exs. 2, 3, 5 § 9.9 and Exs. 7, 9, 10 and 13 § 10.1 (emphasis added). Thus, whether RSL's contract claims against NACT are arbitrable turn on the interpretation of the phrase "disputes arising out of any unauthorized use of the Licensed Software."

## II. Discussion

■ Federal law and policy strongly favor arbitration as a means of alternative dispute resolution. *See Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 130 (2d Cir. 1997). Thus, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Therefore, a district court must stay proceedings if it finds a valid arbitration agreement, *id.* § 3, and may compel arbitration when a party does not abide by that agreement. *Id.* § 4. In addition, the court may dismiss an action if all the claims are arbitrable. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992) ("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.").

■ In determining the arbitrability of a particular dispute, a court must decide: (1) whether the parties agreed to arbitrate; and (2) whether the scope of the agreement encompasses the claims being asserted. *See United States Fire Ins. Co. v. National Gypsum Co.,* 101 F.3d 813, 816 (2d Cir.1996) (citing *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 45 (2d Cir. 1993)). Here, it is beyond dispute that the parties agreed to arbitrate. Thus, the only issue is the scope of the arbitration clause or, more importantly, the exceptions thereto. With regard to the scope of an arbitration clause, the Second Circuit has enunciated the following general principles:

[F]ederal policy strongly favors arbitration as an alternative dispute resolution process. We are instructed that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Accordingly, [f]ederal policy requires us to construe arbitration clauses as broadly as possible. We will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Collins & Aikman Prods. Co. v. Building Sys., Inc.,* 58 F.3d 16, 19 (2d Cir.1995) (internal quotation marks and citations omitted) (brackets in original). Moreover, a broadly-worded arbitration clause, such as the one here,[5] creates a strong presumption in favor of arbitrability that applies with even greater force. *See A T & T Techs., Inc. v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *Oldroyd v.*

---

5. Arbitration clauses providing for arbitration of all disputes arising out of or in connection with an agreement are, without further limitation, extremely broad in scope. *See McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825, 832 (2d Cir.1988) (noting distinction between "broad" clauses that purport to refer to arbitration all disputes arising out of a contract and "narrow" clauses that limit arbitration to specific types of disputes) (citations omitted). Although the arbitration clause in dispute does contain certain limitations, those limitations are very specific and therefore do not significantly impact the broad nature of the clause in issue.

*Elmira Sav. Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998). *See also Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). If the court finds that the parties intended the dispute to be arbitrated, the Federal Arbitration Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

■ Applying the above rules to the circumstances at hand, I find that the term "any unauthorized use of the Licensed Software or Documentation" was meant to refer only to uses not authorized by NACT, not to uses that may violate the United States patent laws. The following provisions of the RSL–NACT Agreements lend support to this interpretation:

> With respect to all disputes arising out of any unauthorized use of the Licensed Software or Documentation, related to NACT's Confidential Information, each of the parties hereby specifically and irrevocably (i) consents to service of process within the state of Utah and to the jurisdiction of the courts located in the state of Utah with respect to all matters relating to this Agreement, ....

Wallace Aff. Exs. 2, 3, 5 § 9.8 and Exs. 7, 9, 10 and 13 § 11.7.

> CUSTOMER shall hold NACT's Confidential Information in the strictest confidence, shall use the same solely for the limited and express purposes of this Agreement, and shall exercise at least the same degree of care to protect NACT's Confidential Information as it uses with respect to its own most sensi-

tive information, but in no event less than reasonable care. CUSTOMER shall not disclose or give access to any of NACT's Confidential Information except to its employees who have a legitimate need for the information in connection with this Agreement. Immediately upon termination of this Agreement, CUSTOMER shall return all of NACT's Confidential Information and all copies thereof, to NACT.

Wallace Aff. Exs. 2, 3, 5, 7, 9, 10 and 13 § 8.2

■ These passages demonstrate that NACT meant to exempt from arbitration only those disputes resulting from uses of its proprietary and confidential software that it deemed unauthorized.[6] This was done in order to permit NACT to obtain immediate injunctions restraining any such unauthorized uses. *See* Wallace Aff. Exs. 2, 3, 5 § 9.10 and Exs. 7, 9, 10 and 13 § 7.6 ("NACT shall be entitled to an immediate injunction restraining any violation of any provisions relating to CUSTOMER'S use of the Licensed Software ...."). To find this unauthorized use exemption applicable to indemnification disputes resulting from allegedly infringing uses of the software would be a strained interpretation indeed. The very existence of the indemnification clauses demonstrates that, at the time the parties entered into the RSL–NACT Agreements, they did not believe they needed authorization from Aerotel to use the product. Thus, RSL's contractual claims for indemnification, breach of contract, and the like fall within the purview of the arbitration clause.

RSL's Lanham Act claim and tort claims for unfair competition, fraud, and negligent misrepresentation are also arbitrable. All of these claims are based on alleged misrepresentations made in NACT's "Special Report" including the statement that

---

6. It is a well-established maxim of contract interpretation that a court must review the entire contract in order to analyze a particular provision. *See Hanson v. McCaw Cellular Communications, Inc.,* 77 F.3d 663, 668 (2d Cir.1996) ("A contract must be construed as a whole and the intention of the parties must be ascertained from the consideration of the entire contract, not some isolate portion.") (internal quotation marks and citations omitted).

"NACT's customers are protected by their sales agreements as to patent infringement." This statement, however, goes to the heart of RSL's contract claims. "In determining whether a particular claim falls within the scope of the parties' arbitration agreement, [courts] focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir.1987) (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 622 n. 9, 625 n. 13, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). Accordingly, RSL's tort claims arise out of the contractual relationship between the parties and are merely restatements of RSL's contract claims. "If the allegations underlying the claims 'touch matters' covered by the parties' sales agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Id.* (citing *Mitsubishi*, 473 U.S. at 625 n. 13, 105 S.Ct. 3346). *See also McMahon v. RMS Elecs., Inc.*, 618 F.Supp. 189, 191 (S.D.N.Y.1985) (citing *Altshul Stern & Co., Inc. v. Mitsui Bussan Kaisha, Ltd.*, 385 F.2d 158, 159 (2d Cir. 1967) ("When a tort claim is based in substantial part on the contractual rights and responsibilities of the two parties, then it must be arbitrated as required by an arbitration clause." )).

### III. Conclusion

For the reasons set forth above, NACT's motion is granted. Because all of the claims set forth in the third party action are arbitrable, the third party complaint is dismissed. *See Berger v. Cantor Fitzgerald Secs.*, 967 F.Supp. 91, 96 (S.D.N.Y. 1997) ("As all of the plaintiff's claims must be submitted to arbitration, no useful purpose will be served by granting a stay of these proceedings.") (citations omitted). RSL and RSL USA are directed to pursue their third party claims against NACT in arbitration. The resulting piecemeal resolution, although unfortunate, is unavoidable and necessary to give effect to a valid arbitration agreement. *See Moses H.*

*Cone*, 460 U.S. at 20, 103 S.Ct. 927; *see also Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1298 (3d Cir.1996) (enforcing arbitration clause even where party was forced to litigate in multiple fora). A conference for the remaining parties has been scheduled for June 2, 2000 at 4:30 p.m.

SO ORDERED: