Hugh A. CHAIRNOFF and Howard Rosof, Plaintiffs,

v.

NATIONAL WESTMINSTER BANK, N.A., t/a Fleet Bank of New York, N.A., Fleet Bank, N.A., Defendants.

No. 00 CIV. 3659(VM).

United States District Court, S.D. New York.

March 18, 2004.

---

582

Arnold S. Klein, Meltzer Lippe Goldstein Wolf, Mineola, NY, for Plaintiffs.

Carmine D. Boccuzzi, Jr., Mitchell A. Lowenthal, Cleary, Gottlieb, Steen & Hamilton, New York City, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

In this action, two senior bank executives ("Plaintiffs") allege that their former employer underpaid them by over $600,000 under a certain incentive compensation plan. The executives previously prosecuted a class action lawsuit in New York state court to recover money allegedly owed to them pursuant to a separate, though very similar, incentive compensation plan. The state court, after a trial and full appeals, dismissed that lawsuit on the ground that the bank's calculations did not violate the terms of the incentive compensation plan there at issue. The defendants now move this Court to dismiss the present action on, among other grounds, the theory of collateral estoppel. The Court, having compared the issues and relevant contract language disputed here, concludes that the two are materially identical to those involved in the state court lawsuit. Accordingly, the motion is granted.

## I. BACKGROUND [1]

In July 1990, National Westminster Bancorp, Inc. ("NatWest") implemented a Phantom Stock Appreciation Plan (the "PSAP"), for the stated purpose of "provid[ing] key employees with financial incentives for improving the long-term performance of" NatWest. *See* Bocuzzi Aff. Ex. C ("PSAP") § I. The PSAP awarded

---

1. The Court derives the factual recitation from (1) the affidavit of Carmine D. Bocuzzi, dated Dec. 23, 2003 ("Bocuzzi Aff."), (2) the affidavit of Arnold S. Klein, dated Feb. 13, 2004, and (3) the affidavit of Mitchell A. Lowenthal, dated Mar. 12, 2004, and the exhibits attached to those documents. Except where necessary, the Court will not cite these sources further.

participants "phantom" stock—NatWest did not have actual stock to issue because it was not a publicly held company but a subsidiary of another bank—and under certain circumstances the participants could exercise their right to a cash payout based on the increased "value" of their notional interest represented by that phantom stock, as determined by the computed value of NatWest. An independent investment bank, Morgan Stanley, periodically calculated the fictional "fair market value" of the phantom stock, and PSAP participants were entitled to a certain percentage of the stock's increase in value from the time NatWest granted the notional interest to the time the participants exercised their right to cash out. A participant's right to cash out did not fully vest until three years after NatWest granted him the phantom stock.

The PSAP vested NatWest's Compensation Committee with broad discretion to interpret and administer the PSAP, including the discretion to make any "determinations . . . deemed necessary or advisable for the proper administration of the Plan." PSAP § 8.2. Under the heading "CHANGES IN CAPITAL STRUCTURE," the PSAP contemplated that the Compensation Committee might adjust the award calculations to account for, among other things, a recapitalization of NatWest:

> In the event that the number or value of the outstanding shares of Stock are increased or decreased by reason of recapitalization, reclassification, merger, or combination of shares, or dividend or other distribution, the number of Phantom Stock Awards, and/or the Fair Market Value of a share of Stock or of a Unit at the date of grant of a Phantom Stock Award, shall be appropriately adjusted by the Committee, in its sole discretion, so that the proportionate interest represented by the Phantom Stock Awards of each Participant will, to

the extent practicable, be maintained as before the occurrence of such event. PSAP § 6.1. From 1991 through 1994, NatWest's parent, NatWest Plc, made about $1.2 billion in capital payments to NatWest. Upon Morgan Stanley's recommendation, the Compensation Committee accounted for those payments by increasing the number of shares of PSAP stock, *i.e.*, effectively treating the parent company's capital payments to NatWest as stock purchases by the parent. By 1994, the number of such phantom stock plan shares outstanding had more than tripled.

In 1995, NatWest created the "Restricted Stock Unit Plan" (the "RSP"), an incentive compensation plan strikingly similar to the PSAP. The RSP's primary drafter used the PSAP as a model and made only minor changes to the provisions at issue here. Board minutes from NatWest's Compensation Committee demonstrate that NatWest intended the RSP to be administered similarly to the PSP.

The RSP is different from the PSAP in at least three respects, all of which, as the Court will discuss, are ultimately immaterial to the present motion. First, the RSP was limited to a smaller number of participants. Second, the RSP required a participant to wait five years, instead of three, for his rights to fully vest. Third, the RSP entitled participants to a certain cash payout based upon the fair market value of NatWest, as opposed to merely the *increase* in the fair market value as under the PSAP. The provisions of the RSP at issue in this lawsuit are otherwise substantially identical to those of the PSAP.

In May 1996, NatWest's parent agreed to a merger with Fleet Financial Group, Inc., and the resulting combined company, Fleet Bank, N.A., assumed the obligations of the PSAP and RSP. The merger triggered a provision of the plans under which the phantom stock would be valued accord-

ing to NatWest's actual purchase price, which the merger parties agreed would be $3.26 billion. Immediately following the merger, Fleet paid out over $33 million in PSP and RSP awards based upon that purchase price as distributed among the then-outstanding 3,057 shares of NatWest phantom stock. Plaintiffs each received over $1 million.

In a class action lawsuit commenced in the New York State Supreme Court, New York County, that pertained only to the PSAP, Plaintiffs contended that NatWest should have calculated those awards based upon only 1,000 (not 3,057) shares for the simple reason that the PSAP defined the term "Stock" as "common stock of [Nat-West] (no par value), of which there are 1,000 shares issued and outstanding." PSAP § 2.13. The state trial court dismissed the lawsuit because PSAP § 8.4 specifically immunized NatWest from liability for any award determination made in "good faith" and because the court determined that the increase in shares was a good-faith interpretation of the PSAP. The court held that the definition of Stock did not "unambiguously mandate[ ] the use of a 1,000 share figure in connection with a Valuation. It merely note[d], as a historical matter, that 1,000 shares were outstanding, without reference to the use of that number in a Valuation." Bocuzzi Aff. Ex. B, at 10. The court stated that that decision was well within Compensation Committee's discretion, and that there was no evidence that the Compensation Committee exercised that discretion in bad faith.

The New York State Supreme Court, Appellate Division, affirmed on essentially the same grounds. See Feldman v. Nat'l Westminster Bank, N.A., 303 A.D.2d 271, 760 N.Y.S.2d 3 (1st Dep't 2003). The panel held that the Compensation Committee's interpretation of the PSAP was reasonable because PSAP § 6.1 explicitly contemplat-ed that the Compensation Committee might increase the number of outstanding shares. Id. at 4. The panel also pointed out that the Compensation Committee's increase in shares "to account for the increase in [NatWest's] value caused by infusions of capital from [NatWest's] parent is typical both of other phantom stock appreciation plans and of the option plans of publicly traded companies, which the Plan was intended to mimic," and that to calculate the awards otherwise would give the participants an "undeserved windfall." Id. The Appellate Division denied leave to reargue, and the New York Court of Appeals denied leave to appeal. Feldman v. National Westminster Bank, N.A., 100 N.Y.2d 505, 763 N.Y.S.2d 811, 795 N.E.2d 37 (2003) (Table).

During the state court litigation, Plaintiffs filed the present lawsuit in this Court asserting a similar claim concerning the RSP. The complaint in the present actions is substantially identical to the state PSP-related complaint, except that the present action is not a class action. The central allegation in both complaints is that Nat-West should have used a figure of 1,000 shares to calculate incentive awards, instead of 3,057 shares. The parties stipulated to staying their federal lawsuit pending resolution of the state lawsuit.

Fleet Bank, N.A., Fleet Bank of New York, N.A., and National Westminister Bank, N.A., (collectively "Defendants") move for summary judgment on, among other grounds, the theory of collateral estoppel.

## II. STANDARD FOR A SUMMARY JUDGMENT MOTION

The Court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the action to determine which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine," *i.e.*, "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

Throughout this inquiry, the Court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. *See Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996).

### III. *DISCUSSION*

■ The Court must apply New York law to determine whether and to what extent the New York state dismissal of the PSAP class action affects the present case. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."). Under New York law, collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 490 (1984). "The doctrine applies if the issue in the

second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Parker v. Blauvelt Volunteer Fire Co., Inc.*, 93 N.Y.2d 343, 690 N.Y.S.2d 478, 712 N.E.2d 647, 651 (1999). Here, Plaintiffs argue only that the issues are not identical as between the two lawsuits, a question upon which Defendants bear the burden of proof. *See id.*

■ Defendants argue that the issues here are identical to those necessarily decided in the state court litigation because the operative language of the two incentive plans—including the exculpatory clause—is materially the same and because the same Compensation Committee administered both plans in the same manner on the decisive question in both lawsuits: whether the awards should be based upon 3,057 shares of stock or 1,000. In other words, the state court determination that calculating the awards using 3,057 shares instead of 1,000 was a "good faith" construction of the relevant contract language is, according to Defendants, the decisive issue in this case, as well. Defendants emphasize that both Plaintiffs admitted in depositions that the valuation awards under the PSAP and RSP were supposed to be based upon identical valuations of Nat-West.

Plaintiffs first respond that the issues here are different from those resolved in the state PSAP litigation because the RSP, which awards participants phantom stock shares based on NatWest's fair market value (as opposed to the *increase* in that value) is not a true incentive Plan, as is the PSAP. This feature of the RSP, Plaintiffs' argument goes, means that using only 1,000 shares of stock might constitute a "windfall" for a participant of the PSAP (where incentives are key) but not for a

participant of the RSP (where incentives are irrelevant). The Court disagrees.

The RSP explicitly states that it "is designed to provide key employees with financial *incentives* for achieving the long term financial and strategic business goals of" NatWest, *see* Bocuzzi Aff. Ex. D. ("RSP") § 1 (emphasis added), and RSP provisions bear out that purpose in the same manner as does the same language in the PSAP, *i.e.*, by awarding a higher cash payout as the value of NatWest increased. Both Plaintiffs conceded this point in depositions. Thus, the issue of whether Plaintiffs' preferred valuation method would be a windfall to plan participants is the same with respect to the PSAP as with respect to the RSP.

Plaintiffs next respond that the issues here are different from those adjudicated in the state PSAP litigation because NatWest had a history of administering the PSAP under the method Plaintiffs now challenge. But, as Plaintiffs correctly point out, NatWest had not made any RSP awards prior to the merger. Moreover, Plaintiffs highlight that the capital infusions predated the RSP, and thus, they argue, should not have figured in the analysis in making payout awards. The Court finds these historical distinctions immaterial. All of the record evidence, including Plaintiffs' own concessions, suggests that the two plans were to be administered identically in this respect. It would be odd indeed for identically-worded language of two incentive plans, adopted for the same purposes and administered by the same committee, to be interpreted differently as between two plan payouts awarded at the same time in consequence of a single event, NatWest's merger with Fleet. Although the state court mentioned the historic administration of the PSAP, the language the decisive holding relied upon was solely that of the PSAP itself and the Compensation Committee's construction of that language—issues which are identical as between the PSAP and RSP.

Plaintiffs also argue that the Compensation Committee's decision to adjust the number of outstanding shares does not apply where, as here, NatWest's valuation was based upon its purchase price, instead of Morgan Stanley's determination of the fair market value. The Court is unclear how the conclusion of this argument follows from its premise. In any event, the Court finds that this issue does not distinguish the present case from the state court litigation because the class members in the state court litigation also sought PSP awards based upon NatWest's purchase price. Plaintiffs specifically pressed this point in their briefing before the state trial court, which rejected the argument.

■ Finally, Plaintiffs argue that, unlike the state court lawsuit, they seek relief here for breach of their respective employment agreements, not merely the incentive compensation plans. Plaintiffs' complaint makes no mention of this theory, or even of the employment agreements. "A summary judgment opposition brief is not a substitute for a timely motion to amend the complaint," *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F.Supp.2d 535, 544 (S.D.N.Y.2003), and Plaintiffs' failure to raise this issue previously, even on a generous reading of their submissions, is grounds alone to reject their argument. In any event, the argument is meritless because there is nothing in the employment agreements which alters the calculation methodology of the PSAP or RSP.

## IV. *ORDER*

For the reasons stated, it is hereby

**ORDERED** that the motion of Fleet Bank, N.A., Fleet Bank of New York, N.A., and National Westminister Bank,

N.A., for summary judgment is granted and the Clerk of Court is directed to enter judgment on their behalf, dismissing the complaint with prejudice.

The Clerk of Court is directed to close this case.

**SO ORDERED.**